UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>ALVIN REEVES )<br>) | Crim. No. 04-10311-JLT |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Alvin Reeves ("the defendant"), by and through undersigned counsel, submits this memorandum of law in support of his motion to suppress evidence. Specifically, the defendant moves this Honorable Court to enter an order suppressing evidence seized from his apartment by government agents in violation of his rights under the Fourth Amendment to the United States Constitution. The defendant avers that on September 15, 2004, government agents illegally entered his home after obtaining a search warrant lacking in probable cause.

The defendant contends that the government based its search warrant application upon statements from two sources that had obvious motives to lie to the police and upon stale information. Absent probable cause to search the defendant's apartment, the court must order the suppression of all the items illegally obtained from the premises as well as any derivative evidence obtained as the fruit of the poisonous tree.

**FACTS AND BACKGROUND**

On September 15, 2004, United States Postal Inspector Paul K. Durand ("Durand") submitted an application for a warrant to search the premises of 14 Francis Drive, Apartment 8, in Randolph, Massachusetts. The defendant resided at 14 Francis Drive in Randolph. In his application, Durand informed the court that he had probable cause to believe that, inside the Randolph apartment, he would find documents demonstrating the defendant's connection to an identity theft fraud ring. Durand's affidavit in support of the search warrant listed several reasons why Durand believed he had probable cause.

Durand first noted that the defendant had served a 23 month prison term following his guilty plea in federal district court to the crimes of identity theft and bank fraud. The affidavit further noted that the United States Bureau of Prisons ("BOP") had released the defendant from custody in November of 2003, but his term of supervised release including home confinement extended for 36 months.

Beyond the notation of the defendant's criminal history, Durand essentially based his affidavit upon information allegedly provided by two sources. The first source was Anita Dejesus ("Dejesus"). In 2004, Dejesus, the mother of the defendant's child, also was the defendant's girlfriend. On April 27, 2004, Dejesus met with Durand for an interview. During this interview, she told Durand that within the defendant's apartment, she observed scraps of paper containing the names of people other that the defendant. She claimed that she remembered the name "Stephen Flaherty" with an apparent date of birth and social security number scrolled on a piece of paper. When she confronted the defendant, he supposedly said "[N]ow I can pay my cable bill." (Search Warrant

Application at 4). Dejesus also claimed that the defendant obtained a mobile telephone in the name of Sarah Arens.

In May of 2004, Durand contacted a Sarah Arens of Melrose, Massachusetts who reported that someone had stolen her identity and opened a Sprint Mobil PCS account in her name. Sarah Arens also claimed that someone had opened instant credit accounts in her husband's name at Sears. Obtaining the Sprint mobile telephone records, Durand noted that the address information on the account corresponded with the address of the defendant's girlfriend.

On September 11, 2004, the Randolph Police Department arrested the defendant after he supposedly committed a domestic assault upon his girlfriend, Dejesus. Following the alleged domestic assault incident, Dejesus again met with Durand. She told him that she observed the defendant remove $250.00 from what appeared to be a hiding spot in the defendant's living room couch. She also claimed that she saw three or four Fleet Bank withdrawal slips in the amount of $2000 to $2500. She told Durand that the defendant had previously assured her that he had no bank accounts.

Dejesus also told Durand that several months prior to the supposed domestic incident, she had observed two credit cards from Chase Bank and Continental in the names of Charles and David. She stated that the defendant carried the two credit cards in his backpack within his apartment. Dejesus also indicated that on the day she noticed the credit cards, the defendant returned a voicemail from a "girl who goes to the banks and makes withdrawals." (Id. at 7). The defendant allegedly told the girl, "you can do three years" and do not "worry about money." (Id.) Dejesus claimed that she and the defendant then argued about his continued involvement in "bank activity." (Id.) The

3

defendant supposedly told her that law enforcement would not catch him because he did not "go in the banks." (Id.)

The affidavit's second source apparently did go into banks. The second source of information in support of the search warrant was a confidential informant. Durand admitted that on July 7, 2004, a camera at Citizens Bank in Roxbury, Massachusetts captured the image of the confidential informant using the name of David Gilmore, Jr. and withdrawing $9000.00 from his account.

After learning the confidential informant's true identity, Durand met with this person on August 6, 2004 and August 20, 2004. The confidential informant told Durand that (s)he worked for the defendant. The confidential informant stated that (s)he would obtain personal passport photographs at Walgreen's drug store, which the defendant would transfer into a Massachusetts license bearing the name and identifying information of someone other than the confidential informant. The confidential informant claimed that (s)he would use the driver's license to withdraw funds from the victims' bank accounts and that the defendant would compensate him/her for his/her efforts. The confidential informant allegedly visited at least six banks from early Spring of 2004 until July 29, 2004. The confidential informant claimed that the defendant waited outside the bank while the confidential informant conducted the fraudulent transactions.

The affidavit further notes that, on August 24, 2004, the defendant spoke with a woman in Roxbury who the police arrested for possession of cocaine. Although the police did not arrest the defendant, officers did discover $1000.00 in currency on his person. The defendant's probation officer informed Durand that on August 24, 2004, the defendant worked a part time job earning $8.00 per hour for 20 hours per week and that

4

the Probate and Family Court had ordered the garnishment of his wages for child support purposes.

Based upon the information largely supplied by the two sources, Durand submitted his application for a search warrant. He claimed that based upon his training and experience, people involved in identity theft crimes often communicate via cellular telephones and computers. He also noted that identity theft perpetrators often keep evidence of the crimes in their apartments such as transfer receipts, bank records, keys to safety deposit boxes and storage locations, utility bills, telephone bills, cancelled envelopes, and other household service records.

Following the submission of his affidavit, the district court[1] granted Durand's request for a search warrant. The government executed the search warrant on the defendant's apartment. The government recovered, *inter alia*, various paper scraps containing the names of individuals other than the defendant.

## ARGUMENT

Durand's application lacked the probable cause necessary to procure a search warrant. Probability is the touchstone of the probable cause analysis. United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997). Probable cause exists when the four corners of the affidavit in support of the application for a search warrant "demonstrate in some trustworthy fashion the likelihood that an offense has been committed." United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999) (internal punctuation, citations and quotations omitted). "Mere suspicion, rumor, or strong reason to suspect wrongdoing are not sufficient." Id. (internal citations and quotations omitted).

---

[1] The Honorable Judith G. Dein, United States Magistrate Judge for the District of Massachusetts.

If the affidavit bases probable cause largely upon information supplied by a tipster or informant, then the government must supply the reviewing court with some basis for assessing the informant's veracity, reliability, and source of knowledge. Khounsavanh, 113 F.3d at 284. Factors that a reviewing court may consider in determining an informant's veracity include the "basis of knowledge of the person supplying hearsay information; whether informant statements are self-authenticating, whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); [and] whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise." Id. "The risk that the informant is lying or in error need not be wholly eliminated. Rather, what is needed is that the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations." Id. (internal quotations and citations omitted).

In assessing an informant's reliability, the First Circuit recently held that "face to face contact between the informant and the agent, the specific and self-incriminating nature of the tip, and the respectable amount of corroboration" will provide a magistrate with a substantial basis to conclude that a search will yield evidence of criminal activity in the place named in the affidavit. United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005). The First Circuit, however, cautioned that "a probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." Id.

Here, the government based its warrant application upon information supplied by two informants who had strong incentives for prevarication. The first informant was the

defendant's girlfriend, Dejesus. The affidavit reveals no prior dealings with Dejesus. It recounts no instances where she supplied the government or law enforcement with accurate information. Although the government knew her identity, Durand also knew her relationship with the defendant. On September 11, 2004, as noted in Durand's affidavit, the police arrested the defendant following an alleged incident of domestic assault involving Dejesus. Following this incident, Dejesus met with Durand and supplied him with information regarding the defendant's supposed phony credit cards, cash hidden in secret locations in the couch, bank account withdrawal slips, and incriminating conversations regarding his continuing involvement in an identity theft scheme. The government corroborated none of this information.

An individual involved in the heat of a domestic quarrel who herself faced criminal charges for domestic assault has every incentive to lie to the police and exact a measure of revenge.[2] Knowing the defendant's past criminal history, Dejesus recognized how to hurt the defendant. The government should have questioned the defendant's motives when she first approached law enforcement in April of 2004. Following her initial meeting with Durand on April 27, 2004, Dejesus provided incriminating information against the defendant to law enforcement. Again, the government largely failed to authenticate this information. The one fact the government did corroborate was the identity theft of Sarah Arens and the purchasing of a Sprint mobile telephone using her personal information. When the government authenticated this information, however, the

---

[2] In fact, Dejesus later sent the defendant a letter apologizing for lying about him to the government and admitting that she approached law enforcement as a means of gaining her revenge. Although Dejesus' letter falls far outside the four corners of the government's affidavit, the defendant will provide the court and the government with a copy if the court deems the letter pertinent to this motion.

7

Sprint mobile telephone records matched Dejesus' address. This discovery should have alerted the government to the possibility that Dejesus was the actual source of the identity theft and the probability that Dejesus had falsely incriminated her boyfriend.

Indeed, the government most likely recognized the probability of mendacity when Durand first met with Dejesus in April of 2004. Rather than immediately apply for a search warrant, the government waited five months before submitting an affidavit based upon her information. The government likely recognized the probability that she was a lying informer. The government, however, took no steps to reduce this probability.

Not only did the government fail to authenticate Dejesus' allegations, the bulk of the information she supplied was stale. In every warrant application, probable cause exists only if the event described in the affidavit is close enough in time to allow a reviewing court to conclude that a likelihood of criminal activity still exists in the place delineated in the search warrant application. See Sgro v. United States, 287 U.S. 206, 210 (1932) ("it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time") (Hughes, C.J.).

Here, Dejesus provided the government with information regarding the defendant's supposed possession of a scrap of paper containing the name, date of birth, and social security number of Stephen Flaherty. The government, however, never authenticated this information and waited five months before applying for a search warrant. Even the information supplied on September 11, 2004, however, was stale. Dejesus admitted that the phony credits cards that she supposedly observed as well as the incriminating conversations occurred several months prior to her meeting with Durand. Hence, her information, in addition to lacking any indicia of reliability, is untimely. Vigeant, 176

F.3d at 570 (holding that absence of independent corroboration coupled with temporal gap of "six months of before the allegedly suspicious financial transaction" constituted an incurable staleness hurdle); United States v Charest, 602 F.2d 1015, 1018 (1st Cir. 1979) (sixteen day lag between a murder and the issuance of a search warrant rendered probable cause to search for a murder weapon stale).

Faced with a known person who had a compelling motive to lie, the government should have authenticated her details to demonstrate that her "report was not simply made up." Vigeant, 176 F.3d at 570. The government, however, also failed to take appropriate steps to reduce the probability of mendacity with the second informant. The confidential informant, whose identity was known to the government, had an even greater prevarication incentive than Dejesus.

On July 7, 2004, a Citizens Bank camera in Roxbury caught the confidential informant on film. Law enforcement then discovered this person's identity. The government knew that this person had committed the crime of identity fraud. A caught suspect has a powerful incentive to prevaricate and level false incriminating allegations at another individual. Implicating someone else, in fact, might have been the informant's only way to ameliorate the gravity of the situation. The government, however, took no precautions to reduce the probability of mendacity.

The government's affidavit contains no information that the government previously knew the confidential informant or that this person had provided accurate information in the past. The government knew only that it had a confidential informant who desired extrication from a difficult situation. This confidential informant did provide details of how (s)he would obtain a passport identification photograph from Walgreen's drug store,

9

which the defendant allegedly implanted onto a Massachusetts driver's license. The confidential informant also stated that (s)he used the phony driver's licenses at least six banks at the behest of the defendant who would often wait for this person in the car. The government, however, never authenticated or corroborated the informant's details. Rather than seek self-authenticating information that might incriminate the defendant, the government instead merely relied upon self-serving allegations from a self-interested criminal who had no demonstrated track record for reliability.

Corroborative facts are the method of reducing the probability of a lying or inaccurate informer. Khounsavanh, 113 F.3d at 284. Typically, the government verifies details from an unknown informant by conducting controlled transactions. See United States v. Genao, 281 F.3d 305, 309 (1st Cir. 2002) ("The controlled buy did, however, yield a recovery of heroin consistent with the informant's original tip"); Khounsavanh, 113 F.3d at 286 (controlled buy "reduced the chances of a reckless or prevaricating tale") (internal quotations and citations omitted).

Here, the government failed to conduct a controlled transaction. The government failed to take any action that could have allowed the agents an opportunity to observe the defendant allegedly commit his criminal activity. In Khounsavanh and Genao, the government conducted controlled buys to bolster the veracity of informants with no record of reliability. Here, the informants not only are without a record of reliability, they have every reason to engage in prevarication. Given the perverse incentives for the transmittal of false information, the government needed to establish an independent corroborative tie to the defendant. Although the government may argue that the defendant's criminal record for identity theft provides the authentication, the argument is

baseless. In fact, knowledge of the defendant's past criminal record actually increases the informants' motives for prevarication. Rather than ameliorate the possibility of mendacity with direct evidence, the government chose merely to rely upon its suspicious informants. The government's failure to authenticate or corroborate the informants' allegations renders its affidavit fatally defective and lacking in probable cause. Accordingly, the court must order the suppression of the items seized pursuant to the illegal search warrant.

## CONCLUSION

For the foregoing reasons, this court must order the suppression of the items seized in violation of the defendant's rights accorded to him by the Fourth Amendment to the United States Constitution.

Dated: October 17, 2005

                                      Respectfully submitted,
                                      ALVIN REEVES
                                      By his attorneys,

                                      /s/ `Brad Bailey`
                                      _____
                                      Brad Bailey, BBO #549749
                                      Gary G. Pelletier, BBO#631732
                                      DENNER O'MALLEY, LLP
                                      Four Longfellow Place, 35th Floor
                                      Boston, MA 02114
                                      (617) 227-2800